Matthew C. KILGORE, individually and on behalf of all others similarly situated; William Bruce Fuller, individually and on behalf of all others similarly situated; Plaintiffs–Appellees,

v.

KEYBANK, NATIONAL ASSOCIATION, successor in interest to Key-Bank USA, N.A.; Key Education Resources, a division of KeyBank National Association; Great Lakes Education Loan Services, Inc., a Wisconsin corporation, Defendants–Appellants,

Matthew C. Kilgore, individually and on behalf of all others similarly situated; William Bruce Fuller, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

KeyBank, National Association, successor in interest to KeyBank USA, N.A.; Key Education Resources, a division of KeyBank National Association; Great Lakes Education Loan Services, Inc., a Wisconsin corporation, Defendants–Appellees.

Nos. 09–16703, 10–15934.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc Dec. 11, 2012.

Filed April 11, 2013.

Andrew A. August and Kevin F. Rooney, Pinnacle Law Group, LLP; James C. Sturdevant (argued) and Whitney Huston, The Sturdevant Law Firm, San Francisco, CA, for Plaintiffs–Appellees/Appellants.

W. Scott O'Connell (argued) and W. Daniel Deane, Nixon Peabody LLP, Manchester, NH; and Sarah Andre and Matthew A. Richards, Nixon Peabody LLP, San Francisco, CA, for Defendants–Appellants/Appellees.

David Horton, Davis, CA; Hiro N. Aragaki, Los Angeles, CA, for Amici Curiae Law Professors.

Hiro N. Aragaki and David Doeling, Los Angeles, CA, for Amici Curiae Arbitration Professors.

Donald M. Falk, Mayer Brown LLP, Palo Alto, CA; Andrew J. Pincus (argued), Evan M. Tager, Archis A. Parasharami, and Scott M. Noveck, Mayer Brown LLP; Robin S. Conrad and Kate Comerford Todd, National Chamber Litigation Center, Inc., Washington, D.C., for Amicus Curiae The Chamber of Commerce of the United States of America.

Steve Bullock and Kelley L. Hubbard, Office of the Montana Attorney General, Helena, MT, for Amicus Curiae State of Montana.

Arthur D. Levy; Nancy Barron, Kemnitzer, Barron & Krieg LLP, San Francisco, CA, for Amicus Curiae The National Association of Consumer Advocates and The National Consumer Law Center.

Ellen Lake, Oakland, CA; Terisa E. Chaw, The Employee Rights Advocacy Institute for Law & Policy; Rebecca M. Hamburg, National Employment Lawyers Association; Cliff Palefsky, McGuinn, Hillsman & Palefsky, San Francisco, CA, for Amici Curiae National Employment Lawyers Association, The Employee Rights Advocacy Institute for Law & Policy, and California Employment Lawyers Association.

Mark A. Chavez, Chavez & Gertler LLP, Mill Valley, CA, for Amicus Curiae The National Consumer Law Center, National Association of Consumer Advocates, Public Citizen and National Consumers League.

C. Dawn Causey and Gregory F. Taylor, American Bankers Association, Washington, D.C., for Amici Curiae American Bankers Association, Consumer Bankers Association, and the Clearing House Association, L.L.C.

Before: ALEX KOZINSKI, Chief Judge, HARRY PREGERSON, M. MARGARET McKEOWN, WILLIAM A. FLETCHER, RICHARD C. TALLMAN, CONSUELO M. CALLAHAN, MILAN D. SMITH, JR., MARY H. MURGUIA, MORGAN CHRISTEN, PAUL J. WATFORD, and ANDREW D. HURWITZ, Circuit Judges.

Opinion by Judge HURWITZ; Dissent by Judge PREGERSON.

## OPINION

HURWITZ, Circuit Judge:

This appeal involves a putative class action by former students of a failed flight-training school who seek broad injunctive relief against the bank that originated their student loans and the loan servicer. The central issue is whether the district court should have compelled arbitration. We hold that this case does not fall under the narrow "public injunction" exception to the Federal Arbitration Act we recognized in *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1082–84 (9th Cir.2007), and remand with instructions to compel arbitration.

### I.

#### A.

Silver State Helicopters, LLC ("SSH") operated a flight-training school in Oakland, California. SSH referred to Key-Bank, N.A. ("KeyBank") as a "preferred lender" in marketing materials and encouraged prospective students to borrow from KeyBank. KeyBank financed virtu-

ally all SSH student tuition; Great Lakes Educational Loan Services ("Great Lakes") serviced the loans.

Every SSH student borrowing from KeyBank executed a promissory note ("Note"). The Note contained an arbitration clause, located in a section entitled "ARBITRATION," which provided, in relevant part:

> IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR I WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM.... FURTHER, I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION.... I UNDERSTAND THAT OTHER RIGHTS I WOULD HAVE IF I WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION....
>
> There shall be no authority for any Claims to be arbitrated on a class action basis. Furthermore, an arbitration can

only decide your or my Claim(s) and may not consolidate or join the claims of other persons that may have similar claims.

The Note further provided that "[t]his Arbitration Provision will apply to my Note ... unless I notify you in writing that I reject the arbitration provisions within 60 days of signing my Note." [1]

**B.**

Matthew Kilgore and William Fuller ("Plaintiffs") were SSH students, who each borrowed over $50,000 from KeyBank. The Oakland school failed before they could graduate. After the school's demise, Plaintiffs brought this putative class action suit against KeyBank and Great Lakes (collectively, "Defendants") in California Superior Court, seeking to enjoin Defendants from reporting loan defaults to credit agencies and from enforcing Notes against former students.[2] The gravamen of the complaint was that Defendants had violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code §§ 17200–17210, because the Note and SSH's contracts with students failed to include language specified in the Federal Trade Commission's "Holder Rule." [3]

---

1. The Note contained a choice-of-law clause providing that disputes would be governed by Ohio law and a forum-selection provision requiring disputes to be contested in Cuyahoga County, Ohio, KeyBank's principal place of business.

2. Plaintiffs amended the complaint in state court to add a third representative plaintiff, Kevin Wilhelmy, and two defendants, Student Loan Xpress and American Education Services. These parties eventually settled and are no longer involved in this litigation.

3. The Federal Trade Commission promulgated the Holder Rule in 1975 in response to concerns that sellers of goods and services were increasingly separating "the consumer's duty to pay from the seller's duty to perform" either by selling loan instruments to a third party after execution or by acting as a conduit

between purchasers and third-party lenders. Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 40 Fed.Reg. 53,506, 53,507 (Nov. 18, 1975) (emphasis omitted) (codified at 16 C.F.R. pt. 433). The Rule requires consumer credit contracts to include the following language: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF." 16 C.F.R. § 433.2(a).

Plaintiffs do not assert that the Holder Rule gives rise to a private cause of action, but instead seek to vindicate this right through their state law claim. *See Holloway v. Bristol–Myers Corp.*, 485 F.2d 986, 988–89 (D.C.Cir.1973) (holding that private actions to vindicate rights asserted under the Federal

Defendants timely removed the case to the District Court for the Northern District of California,[4] and filed a motion to compel arbitration. After the district court denied the motion, *Kilgore v. Keybank, Nat'l Ass'n,* No. C 08–2958 TEH, 2009 WL 1975271, at *1 (N.D.Cal. July 8, 2009),[5] Defendants appealed. We have jurisdiction over Defendants' appeal under 9 U.S.C. § 16(a)(1)(C).

After Defendants filed their notice of appeal, the district court allowed Plaintiffs to file a third amended complaint. The court then granted Defendants' motion to dismiss for failure to state a claim upon which relief can be granted. *Kilgore v. KeyBank,* 712 F.Supp.2d 939, 947–58 (N.D.Cal.2010).[6] Plaintiffs appealed, and we have jurisdiction under 28 U.S.C. § 1291.[7]

## II.

■ Plaintiffs argue that the district court erred by dismissing their third amended complaint, and Defendants argue that the district court erred by refusing to compel arbitration. Under the Federal Arbitration Act, if Defendants are correct, the district court should never have reached the merits of Plaintiffs' claims. *See* 9 U.S.C. § 3 (requiring stay of civil action during arbitration). Therefore, we

begin with whether the district court erred in declining to compel arbitration, a decision we review *de novo. Chalk v. T–Mobile USA, Inc.,* 560 F.3d 1087, 1092 (9th Cir.2009).

## A.

The Federal Arbitration Act ("FAA") makes an agreement to arbitrate "valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA was intended to "overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625 n. 14, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), that resulted in "courts' refusals to enforce agreements to arbitrate," *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Recent opinions of the Supreme Court have given broad effect to arbitration agreements. *See, e.g., Marmet Health Care Ctr., Inc. v. Brown,* —— U.S. ——, 132 S.Ct. 1201, 1203–04, 182 L.Ed.2d 42 (2012) (per curiam) (upholding arbitration provision despite state law prohibiting predispute agreements to arbitrate personal injury and wrongful death claims); *AT&T Mobility LLC v. Concepcion,* —— U.S.

Trade Commission Act may not be maintained).

4. The notice of removal invoked federal jurisdiction based on a federal question, *see* 28 U.S.C. § 1331; complete diversity of citizenship, *see* 28 U.S.C. § 1332(a); and minimal diversity under the Class Action Fairness Act, *see* 28 U.S.C. § 1332(d)(2). After removal, Plaintiffs dropped their federal question claims.

5. In denying the motion to compel arbitration, the district court applied California law, notwithstanding the Ohio choice-of-law provision in the Note. *Kilgore,* 2009 WL 1975271, at *5–8 (citing *Hoffman v. Citibank (S.D.), N.A.,* 546 F.3d 1078, 1082 (9th Cir.2008) (per

curiam) (applying California conflict-of-law analysis to choice-of-law provision in credit card contract)). We need not consider which law is applicable as the result would be the same in light of our decision that the district court should have compelled arbitration. *See* note 11, *infra.*

6. The district court held that the various counts in the third amended complaint either failed to state a claim upon which relief could be granted, *Kilgore,* 712 F.Supp.2d at 947–53, or were preempted by federal law, *id.* at 953–58.

7. We consolidated the two appeals. Order, *Kilgore v. KeyBank, Nat'l Ass'n,* 673 F.3d 947 (9th Cir.2010).

——, 131 S.Ct. 1740, 1753, 179 L.Ed.2d 742 (2011) (holding that the FAA preempted a California rule that made class action waivers unconscionable); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (confining FAA exemption for workers engaged in interstate commerce to transportation workers).

The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The basic role for courts under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000).

**B.**

Section 2 of the FAA contains a savings clause, which provides that arbitration agreements are "enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This savings clause "preserves generally applicable contract defenses." *Concepcion,* 131 S.Ct. at 1748. Plaintiffs advance two theories as to why the FAA savings clause defeats the arbitration clause in the Note. We find neither availing.

**1.**

Under the FAA savings clause, state law that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" remains

applicable to arbitration agreements. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 685–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quoting *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Casarotto,* 517 U.S. at 687, 116 S.Ct. 1652.

Under California law, a contractual provision is unenforceable if it is both procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

"Substantive unconscionability focuses on the one-sidedness or overly harsh effect of the contract term or clause." *Harper v. Ultimo,* 113 Cal. App.4th 1402, 7 Cal.Rptr.3d 418, 423 (2003). Plaintiffs claimed below that the Note's ban on class arbitration is unconscionable under California law, but that argument is now expressly foreclosed by *Concepcion,* 131 S.Ct. at 1753.[8] Plaintiffs' assertion that students may not be able to afford arbitration fees fares no better. *See Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 90–91, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) ("The 'risk' that [a plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."). And nothing else in the arbitration clause

8. In holding that California law rendered the class arbitration waiver unconscionable, the district court relied on *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005), *abrogated by Concep-*cion, 131 S.Ct. at 1753. In addressing the issue, the district court did not have the benefit of the Supreme Court's later *Concepcion* opinion.

in the Note suggests substantive unconscionability.[9]  *Cf. Armendariz,* 99 Cal. Rptr.2d 745, 6 P.3d at 690–94 (holding unilateral arbitration provision substantively unconscionable); *Harper,* 7 Cal. Rptr.3d at 423 (explaining substantive unconscionability of arbitration damages limit).

Nor is the arbitration provision procedurally unconscionable. "Procedural unconscionability focuses on the factors of surprise and oppression. . . ." *Harper,* 7 Cal.Rptr.3d at 422.  The arbitration clause allows students to reject arbitration within sixty days of signing the Note.  This provision is more forgiving than the one in *Circuit City Stores, Inc. v. Ahmed,* where we found thirty days a sufficient period in which to consider whether to opt out of arbitration.  283 F.3d 1198, 1199–1200 (9th Cir.2002).  Nor was the arbitration clause buried in fine print in the Note, but was instead in its own section, clearly labeled, in boldface.  *Cf. A & M Produce Co. v. FMC Corp.,* 135 Cal. App.3d 473, 186 Cal.Rptr. 114, 124–25 (1982) (finding procedural unconscionability of consequential damage provision contained in middle of last page of an agreement in inconspicuous font).

### 2.

#### a.

The UCL authorizes broad injunctive relief to protect the public from unfair business practices.  Cal. Bus. & Prof.Code § 17203.  The Supreme Court has suggested that claims arising from a statute whose underlying purpose creates an "inherent conflict" with the federal policy favoring arbitration may be exempt from the FAA.[10]  *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).  Relying on *Gilmer,* the California Supreme Court has found an inherent conflict between the FAA policy favoring arbitration and California statutes authorizing "public" injunctive relief.  *Broughton v. Cigna Healthplans of Cal.,* 21 Cal.4th 1066, 90 Cal. Rptr.2d 334, 988 P.2d 67, 73, 78 (1999).

The *Broughton* plaintiffs "were covered by Medi–Cal, which had negotiated a contract with Cigna . . . for health care coverage."  *Id.* at 71.  They sued Cigna under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code §§ 1750–85, seeking damages for medical malpractice and injunctive relief against Cigna's allegedly deceptive advertising.  *Broughton,* 90 Cal.Rptr.2d 334, 988 P.2d at 71.  The California Supreme Court held the damages claim subject to the arbitration clause in the Cigna policy because "[s]uch an action is primarily for the benefit of a party to the arbitration, even if the action incidentally vindicates important public interests."  *Id.* at 79.  But the Court also found that because the plaintiffs were "functioning as a private attorney general, enjoining future deceptive practices on behalf of the general public," *id.* at 76, their injunction claims were not arbitrable, *id.* at 75–78.

The California Supreme Court expanded upon *Broughton* in *Cruz v. PacifiCare*

---

**9.**  The Note also includes a clause preventing disclosure of any arbitration award.  Although we have found confidentiality provisions to be substantively unconscionable when applied to a large class of customers, *Ting v. AT&T,* 319 F.3d 1126, 1151–52 (9th Cir.2003), the small number of putative class members in this case (approximately 120) mitigates such concerns.  In any event, the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general.  Plaintiffs are free to argue during arbitration that the confidentiality clause is not enforceable.

**10.**  The parties dispute whether the "inherent conflict" exemption is limited to federal statutes or applies to both federal and state statutes.  For the reasons discussed below, we need not resolve this issue.

*Health Systems, Inc.,* 30 Cal.4th 303, 133 Cal.Rptr.2d 58, 66 P.3d 1157 (2003). Plaintiff there alleged that PacifiCare had fraudulently induced its customers to enroll in health care programs while at the same time discouraging primary care physicians from providing services to enrollees. *Id.* at 1159. The complaint sought injunctive and monetary relief under the UCL, Cal. Bus. & Prof.Code § 17200, which prohibits unfair business practices, and under section 17500 of the same, which prohibits untrue or misleading statements designed to mislead the public. *Cruz,* 133 Cal.Rptr.2d 58, 66 P.3d at 1164–65. PacifiCare invoked the arbitration clause in its contract with enrollees. *Id.* at 1160.

As in *Broughton,* the California Supreme Court in *Cruz* held that the plaintiff's claims for monetary relief were subject to arbitration, because any public benefit from such relief would be "incidental to the private benefits obtained from those bringing the restitutionary or damages action." *Id.* at 1166. Extending the reasoning of *Broughton* to claims brought under the UCL and Business and Professions Code, the *Cruz* court found "the request for injunctive relief is clearly for the benefit of health care consumers and the general public" and therefore not subject to arbitration. *Id.* at 1164.

We applied the *Broughton–Cruz* framework in *Davis,* 485 F.3d at 1081–84. There, an employer "adopted and distributed to its employees a new Dispute Resolution Program (DRP) that culminated in final and binding arbitration of most employment-related claims by and against its employees." *Id.* at 1070. The DRP prohibited the filing of both judicial and administrative actions. *Id.* at 1081–82. Citing the *Gilmer* dictum, we noted that "employment rights under the [Fair Labor Standards Act] and California's Labor Code" were analogous to substantive

"statutory rights established for a public reason." *Id.* at 1082 (internal quotations and citations omitted). Because the *Davis* plaintiffs sought to vindicate these statutory rights through public injunctions, we found the DRP unenforceable to the extent that it barred claims for public injunctive relief. *Id.*

**b.**

■■■ Defendants argue that *Davis* was vitiated by *Concepcion,* and the *Broughton–Cruz* rule no longer exempts a public injunction claim from arbitration. We need not reach that broad argument. Even assuming the continued viability of the *Broughton–Cruz* rule, Plaintiffs' claims do not fall within its purview.

Public injunctive relief "is for the benefit of the general public rather than the party bringing the action." *Broughton,* 90 Cal. Rptr.2d 334, 988 P.2d at 78. A claim for public injunctive relief therefore does not seek "to resolve a private dispute but to remedy a public wrong." *Id.* at 76. Whatever the subjective motivation behind a party's purported public injunction suit, the *Broughton* rule applies only when "the benefits of granting injunctive relief by and large do not accrue to that party, but to the general public in danger of being victimized by the same deceptive practices as the plaintiff suffered." *Id.*

The claim for injunctive relief here does not fall within the "narrow exception to the rule that the FAA requires state courts to honor arbitration agreements." *Cruz,* 133 Cal.Rptr.2d 58, 66 P.3d at 1162. The third amended complaint seeks an injunction prohibiting Defendants from reporting non-payment of a Note by putative class members to credit agencies, from enforcing a Note against any class member, and from disbursing the proceeds of any loans to a seller whose consumer credit contract did not include Holder Rule language.

The requested prohibitions against reporting defaults on the Note and seeking enforcement of the Note plainly would benefit only the approximately 120 putative class members. The requested injunction against disbursing loans to sellers who do not include Holder Rule language in their contracts, while ostensibly implicating third parties, also falls outside the *Broughton–Cruz* rule. The third amended complaint expressly notes that KeyBank had completely withdrawn from the private school loan business and does not allege that the bank is engaging in other comparable transactions. The injunctive relief sought thus, for all practical purposes, relates only to past harms suffered by the members of the limited putative class.

The central premise of *Broughton–Cruz* is that "the judicial forum has significant institutional advantages over arbitration in administering a public injunctive remedy, which as a consequence will likely lead to the diminution or frustration of the public benefit if the remedy is entrusted to arbitrators." *Broughton*, 90 Cal.Rptr.2d 334, 988 P.2d at 78. That concern is absent here, where Defendants' alleged statutory violations have, by Plaintiffs' own admission, already ceased, where the class affected by the alleged practices is small, and where class affected by the alleged practices is small, and where there is no real prospective benefit to the public at large from the relief sought.[11]

### III.

For the reasons above, we **VACATE** the district court's dismissal of Plaintiffs' claims, **REVERSE** the denial of Defendants' motion to compel arbitration, and **REMAND** with instructions to the district court to compel arbitration.

11. Because we hold that arbitration is required under California law, we need not address Defendants' contention that Ohio law (which apparently has no *Broughton–Cruz* rule, *see Eagle v. Fred Martin Motor Co.*, 157

PREGERSON, Circuit Judge, dissenting:

## I. Hustled by the school; hustled by the bank.

Silver State Helicopter School did not do a good job training helicopter pilots, placing them in jobs, or managing its own finances. But it did make a convincing sales pitch. Silver State promised its students that they would get the training required to get good paying jobs as commercial helicopter pilots.

At flashy career fairs around California, Silver State worked hard to sign up prospective students for its helicopter pilot training program. Former Silver State student, Mathew Kilgore, declared under penalty of perjury:

> The seminar was very impressive and glitzy. There were numerous helicopters onsite and the school appeared to be very professional. [Silver State's CEO, Jerry Airola] was very convincing and portrayed Silver State as a top flight school. The presentation made clear that Silver State was very selective about which students would be chosen to attend the school ... Mr. Airola emphasized that all of the tuition to fund the entire Silver State education could be obtained through Silver State's partner lender, KeyBank. Mr. Airola also emphasized that ... the loans would only cost the students about [a] hundred dollars a week at 4% interest.

Airola's claims were not true. Silver State accepted almost all applicants who could get their loans approved. Silver State lacked sufficient equipment or instructors to properly train its students. The variable rate interest on the loans would rise far above four percent.[1] Matthew Kilgore,

Ohio App.3d 150, 809 N.E.2d 1161, 1170 (2004)) should apply.

1. *See* Appendix at 9.

William Fuller, and the other 120 putative class members believed what Airola told them and signed up. They took out $55,950 loans, which KeyBank promptly forked over to Silver State before students took a single class.

But Silver State knew it was headed for a crash landing. By 2008, Silver State had racked up ten million dollars in debt against fifty thousand dollars in assets. Moreover, despite Silver State's alluring promises, there was no significant demand for helicopter pilots with a Silver State degree. And it wasn't just the school that knew it. Defendant KeyBank knew it, too.

KeyBank, an Ohio-based lending giant, participated in the fraud that Silver State perpetrated on unwitting students. From 2003 to 2005 KeyBank financed ninety-five percent of the tuition students paid to Silver State. KeyBank printed up lengthy loan papers that lacked the Federal Trade Commission's Holder Rule Notice. 16 C.F.R. § 433.2 The Holder Rule required the loan contracts to notify students that KeyBank was subject to the same claims and defenses as Silver State. *Id.* The Holder Rule protects borrowers, such as the students, from being legally obligated to pay a creditor like KeyBank "despite breach of warranty, misrepresentation, or even fraud on the part of the seller." 40 Fed.Reg. 53,506, 53,507 (Nov. 18, 1975). By omitting that notice from its printed loan contracts, KeyBank may have sought to insulate itself from liability for Silver State's misleading promises. Silver State then presented those faulty loan contracts to prospective students and "pressure[d] the students to sign the [master promissory notes] as soon as possible," according to an affidavit of Silver State's former student finance manager Jody Pidruzny. And sign up they did.

Once a student signed the promissory note, KeyBank immediately transferred the full amount of the loans to Silver State. KeyBank then turned a profit by selling the students' loans on the securities market to investors. Defendant Great Lakes Educational Loan Services, Inc. continues to service those loans by collecting payments from students, and notifying credit reporting agencies when students fail to pay.

KeyBank loaned students tuition money to attend Silver State knowing that Silver State was financially volatile. A 2004 email between KeyBank Vice Presidents Paul McDermott and Rodney Landrum predicted that Silver State "could be the next 'big one' to go under." Nevertheless, KeyBank made more than ten million dollars in loans to Silver State students over the following two years. In 2008, Silver State filed for bankruptcy and closed its doors. Students could not recoup the amount of their unused tuition because Silver State sought protection under Chapter 7 bankruptcy proceedings.

Kilgore, Fuller, and their classmates were left holding the bag with no degree, no helicopter piloting career, and no opportunity to train. The students' failed attempts to launch flight careers saddled them with huge private loans that are collecting interest and weighing them down.

The private loans students incurred to pay for Silver State helicopter pilot training were not subsidized or insured by the federal government. Private student loans are generally more expensive than federal loans, especially for students with lower credit scores or limited credit histories. Students could borrow larger amounts because there are no loan limits for private loans. Moreover, students who hold private loans are not eligible for federal programs that allow them to reduce their monthly payments based on their income, or have their loans forgiven after working for ten years in public service jobs.[2]

**2.** *See* Editorial, *Student Debt and the Econo-* my, N.Y. Times, March 10, 2013, at SR 10

Unlike federally guaranteed loans, private student loans are not discharged should the school go out of business. The students themselves cannot discharge these loans in bankruptcy proceedings unless they can prove that "excepting such [student] debt from discharge ... would impose an undue hardship." 11 U.S.C. § 523(a)(8).

## II. Ignored by the courts.

To make matters worse, the majority opinion strips Kilgore, Fuller, and their classmates of the ability to find recourse in state or federal court. The majority holds that we must compel arbitration in the students' case, a holding at odds with the district court's decision. According to the majority, the arbitration clause was not unconscionable. I disagree.

A contract provision is unenforceable under California law if it is both procedurally and substantively unconscionable. *See Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 996 (9th Cir.2010). California applies a sliding scale to determine if a contract is unenforceable due to unconscionability. *Armendariz v. Found. Health Psychcare Servs.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000). The more substantively unconscionable the contract, the less procedurally unconscionable it must be to be found unconscionable, and vice versa. *Id.* Here, the arbitration clause is highly procedurally *and* substantively unconscionable.

### A. Procedurally Unconscionable

If both parties agree to give up the protections of the courts, arbitration can be a just and efficient way to resolve disputes. But Kilgore, Fuller, and their classmates signed contracts under unconscionable "take it or leave it" conditions.

*Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 996 (9th Cir.2010). This means that they did not agree to arbitration. Without such an agreement, it is wholly inappropriate to stop them from having their claims decided by a court.

Under California law: "A contract is procedurally unconscionable if it is a contract of adhesion, *i.e.,* a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting v. AT&T,* 319 F.3d 1126, 1148 (9th Cir. 2003). Procedural unconscionability focuses on the "the factors of surprise and oppression in the contracting process." *Pokorny,* 601 F.3d at 996.

There can be no doubt that the promissory notes were contracts of adhesion, and that surprise and oppression dominated the contracting process. I have attached as an Appendix the dense, small print, and blurry nine-page contract that Silver State thrust on the students at career fairs and open houses. The arbitration clause at issue was buried in the middle of the contract, split over two pages, and surrounded by language that was difficult to read and understand. *See* Appendix at 3–4; *see also Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1171 (2003) ("Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." (internal quotations and citations omitted)). KeyBank officials never discussed the loans with students or mentioned the arbitration clause to them. KeyBank left those jobs to Silver State's financial aid staff—employees who, according to the record, did not know that the

("Because private loans offer little flexibility, borrowers in bad straits have few options except default, which makes it difficult for

them to get jobs or credit, or even to rent apartments.").

loans contained arbitration clauses. Silver State staff pressured students to sign the loans immediately or else risk losing their spots in the school. Pidruzny, the school's Student Finance Manager, explained the strategy in her sworn declaration:

> At the direction of my superiors I conveyed KeyBank's and Silver State's directives to expedite the loan application process and pressure the students to sign the [Master Promissory Notes] as soon as possible ... I did not discuss the terms of the [Master Promissory Notes] with Silver State students. Specifically, I did not discuss the Arbitration Provision with any Silver State Student....

In light of these facts, it is unsurprising that students felt pressured to sign the contract without knowing it contained an arbitration clause. Moreover, the sixty day opt-out provision was meaningless because students did not know the arbitration clause existed in the first place. As Kilgore declared, "I did not know that the Promissory Note contained an arbitration provision (nor did I know that I could opt out of the arbitration provision) ... I believed that the Promissory Note had to be signed immediately and I felt pressured to do so. I believed that if I did not sign the Promissory Note I would lose my spot at Silver State." Surprise? Yes. Oppression? Yes. Procedural unconscionability? Definitely.

### B. Substantively Unconscionable

A contract provision is substantively unconscionable if it is "one-sided and will have an overly harsh effect on the disadvantaged party. Thus, mutuality is the paramount consideration when assessing substantive unconscionability." *Pokorny,* 601 F.3d at 997 (internal quotations and citations omitted). To make that determination, courts must "look beyond facial neutrality and examine the actual effects of the challenged provision." *Ting,* 319 F.3d at 1149. KeyBank's contract fails the mutuality test in three respects:

**1.** The confidentiality provision requires both parties to maintain the confidentiality of any claim they arbitrate. While facially neutral, this claim overwhelmingly favors KeyBank. A student who wins in arbitration against KeyBank cannot alert other students or arbitrators to KeyBank's predatory practices that led to the win. But KeyBank is a repeat player in these arbitrations; it knows the outcome of each arbitration and can use that knowledge to its advantage. *Id.* at 1152 (Defendant "has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, defendant accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract.").

**2.** The high cost of arbitration imposes another unequal burden, creating further substantive unconscionability. Filing a civil case in California Superior Court costs less than five hundred dollars. Filing the same claim before an arbitrator, runs more than four thousand dollars. The high cost of arbitration will prevent many students from vindicating their rights, but will not limit KeyBank's ability to defend itself. This asymmetry makes arbitration all the more unconscionable. *See Ting,* 319 F.3d at 1151 (finding a fee-splitting arbitration clause unconscionable "because it imposes on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court.").

**3.** The arbitration process itself greatly favors banks over consumers. One study found that the National Arbitration Forum, one of the two arbitrators named in the contract, ruled for banks and credit card companies, and against consumers

ninety-four percent of the time.[3] This further gives KeyBank an unfair advantage in resolving any claims.

KeyBank foisted loans on students who staked their financial well-being on the shaky promises of Silver State Helicopter school. When Silver State went down, so did the students. The students deserve, and I submit the law requires, that their claims be heard and adjudicated by a court. The provision in the promissory note relegating students to arbitration is unconscionable and thus unenforceable. Therefore, I dissent.

**3.** Public Citizen, *The Arbitration Trap: How Credit Card Companies Ensnare Consumers* 2 (2007), available at http://www.citizen.org/ documents/ArbitrationTrap.pdf.